# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RIVER OF LIFE KINGDOM MINISTRIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 C 0950 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| VILLAGE OF HAZEL CREST, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are two motions: (1) plaintiff's motion for a preliminary injunction [5]; and (2) defendant's motion to supplement the record [28]. For the reasons stated below, defendant's motion is granted and plaintiff's motion is denied.

## I. BACKGROUND

### A. Procedural Posture

On February 15, 2008, plaintiff, River of Life Kingdom Ministries ("the Church"), filed a motion for a temporary restraining order ("TRO") and preliminary injunction. The motion seeks to enjoin the Village of Hazel Crest (the "Village") from enforcing certain provisions of its Zoning Ordinance because of alleged violations of the Equal Terms provision of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"), and the Church's First Amendment right to freedom of speech. Following expedited briefing, the court denied the motion for a TRO on February 27, 2008, informing the parties of the decision at a status hearing and subsequently issuing a written order. A preliminary injunction hearing was held on March 13, 2008, delayed, in part, by the counsel for the Village's vacation and trial schedule.

1

Following the hearing, upon request of the parties, the court allowed post-hearing briefs, requiring opening briefs on March 24, 2008 and responses on March 31, 2008.[1] Due to flooding in plaintiff's counsel's offices, on March 27, 2008, the court granted the Church's unopposed motion for extension of the briefing schedule through April 2, 2008.

On April 9, 2008, the Village filed a motion to supplement the preliminary injunction hearing record, noticed for April 17, 2008. The supplemental evidence is a copy of Ordinance No. 07-2008 (the "Amended Ordinance").[2] The Church filed a memorandum in opposition. At the motion call on April 17, 2008, the court invited further briefing on the impact of the proposed supplemental evidence on the preliminary injunction motion and requested that the parties also more thoroughly address the relationship between the Equal Terms provision of RLUIPA and the Free Exercise Clause of the First Amendment. The Village filed a supplemental memorandum on April 28, 2008. Following expedited discovery, on May 2, 2008,

---

[1] The court requested that the parties address: (1) whether the Church's likelihood of success on the merits was affected by the Village's Tax Increment Financing ("TIF") District and the inability of businesses within 100 feet of a church to obtain a liquor license; (2) specific facts relating to the existence of irreparable harm and how the balance of harms should be weighed; (3) how certain recent cases discussing RLUIPA applied to the facts of this case, specifically *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612 (7th Cir. 2007), *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007), *cert. denied*, ___ U.S. ___, 128 S. Ct. 2503 (2008), and *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295 (11th Cir. 2006).

[2] At a status hearing held on February 27, 2008, counsel for the Village told the court: "We have no intention to amend the ordinance." Tr. at 10:16-17. The court's concern at that time was holding the preliminary injunction hearing before any amendment could take place. Counsel for the Village went on to assure the court that "[i]n order to amend a zoning ordinance, you have to have a public hearing in front of the zoning board of appeals with a . . . 15, 30 day notice, actual notice has to go to the property owner. As a bread-and-butter thing in Illinois law *you can't amend a zoning ordinance under 60 days*." Tr. at 10:24-11:4 (emphasis added). The hearing and briefing schedule was set based on these representations, 41 days before the vote on the amendment.

2

the Church filed its final brief on this matter.  On May 12, 2008, the Village filed another

supplemental submission regarding the impact of the Amended Ordinance.  The matter is now

fully briefed and ready for decision.

**B.     Facts[3]**

The Church has approximately sixty-seven congregants, about half of whom regularly

attend services.  The Church's pastor and president is Barbara Alexander ("Pastor Alexander").

The Church holds a Sunday service and a Wednesday night Bible study, in addition to a

women's ministry every third Saturday of the month.  It currently leases shared space on a

month-to-month basis, but the premises are available only for five or six hours a week and are

poorly maintained.  The Church wants to expand its ministry activities to include a literacy

program, mentoring program for young men, bookstore, and assistance to start-up businesses.

To this end, the Church began looking for property to purchase.

The Village has a population of almost 15,000.  In January 2001, it adopted a Tax

Increment Financing ("TIF") plan and designated the area known as "Hazel Crest Proper," near

the Metra station, as a TIF District.  Pursuant to the TIF plan, the Village was allowed to freeze

the amount of property taxes schools, parks, and other bodies get from the TIF District for

twenty-three years.  As taxes increase, the Village keeps the amount over and above the level at

which the taxes were frozen as a "tax increment" to apply to further development in the TIF

District.  The Village has amassed over $500,000 in TIF funds, although it has not spent any of it

as of this date.  The Village hopes to attract "transit-oriented development," specifically

---

[3]The facts are taken from the parties' pleadings and evidence presented at the preliminary
injunction hearing on March 13, 2008.

businesses of interest to commuters such as convenience stores and dry cleaners, although no new businesses have come into the area pursuant to the TIF as of this date. The Village has begun work developing parking facilities and bicycle trails, securing over $450,000 in grant money. In March 2007, the Village issued a Comprehensive Plan that outlined its vision, goals, and objectives for the future, including commercial development of Hazel Crest Proper.

On October 29, 2007, the Church bought the property located at 16842 Park Avenue, Hazel Crest, Illinois, for $159,900. The Church intended to convert the property, an old warehouse and office, to use as a church. It chose the building because of its size, location, and price and because it believed Hazel Crest was a good location in which to establish itself. The property is located in the "B-2 Service Business District" at the far north-east corner of the Village's TIF District. However, the Village Zoning Ordinance does not permit churches in the B-2 District because that area is reserved for commercial development. The Church knew about the TIF, but, relying on a superseded 1998 version of the Zoning Ordinance and erroneous legal advice, believed that it could obtain a "Special Use Permit." Therefore, it did not foresee a problem when it agreed to waive the zoning contingency in the sales contract for the property. The Church applied to the Village for a Special Use Permit on September 9, 2007. On November 26, 2007, the Planning & Zoning Commission advised the Village that it did not recommend approval of a permit. Subsequently, on January 8, 2008, the Village Board of Trustees voted against granting the Church permission to use the premises as a church. The Village sent the Church a letter on January 11, 2008, informing it of the decision. The Church then sued the Village asking for: (1) a declaratory judgment that the Zoning Ordinance violated the First and Fourteenth Amendments of the U.S. Constitution and RLUIPA; (2) an order

enjoining the enforcement of the Zoning Ordinance (and therefore requiring the Village to allow

the Church to occupy the property); and (3) monetary damages.

**C.     The Amended Ordinance**

On April 8, 2008, the Village Board of Trustees unanimously voted to adopt Ordinance

No. 07-2008: An Ordinance Amending the Hazel Crest Zoning Ordinance by Amending the

Permitted and Special Uses in the B-2 Zoning District.  The Agenda for the Village Board

meeting explained:

> Several special uses in the B-2 Zoning District do not contribute to the tax base of
> the Village and are viewed as incompatible with commercial development and
> redevelopment.  On that basis, such uses are viewed as not being appropriate land
> uses for the B-2 Zoning District.  The Village Attorney has drafted an ordinance
> that eliminates some of the existing uses in the B-2 District and leaves a list of
> uses identified in the proposed ordinance.  A total of 11 Permitted Use categories
> remain and 3 Special Use Categories.

Agenda, Regular Village Board Meeting ¶ 8(E) (Apr. 8, 2008), attached as exhibit to Def.'s

Supp. Submission.  The Amended Ordinance includes as Permitted Uses: (1) all general

commercial and retail uses; (2) automobile service stations including indoor car wash; (3) dry-

cleaning establishments; (4) hotels and motels; (5) medical and dental clinics, including optical;

(6) mixed use developments consisting of allowable commercial uses on the ground floor, and

residential uses above the first floor; (7) business and professional offices; (8) commercial

gymnasiums, health clubs, and salons; (9) restaurants, including the serving of alcoholic

beverages if incidental to the serving of food as the principal activity; (10) taverns or cocktail

lounges, but not including live entertainment or dancing; and (11) accessory uses to the above

permitted uses.  It eliminates as Permitted Uses art galleries, funeral parlors, and meeting halls.

It eliminates as enumerated Special Uses art galleries and museums, day-care centers,[4] schools, libraries, and recreational buildings and community centers.

The Church challenges the validity of the amendment, arguing that the Village did not follow proper procedures. It raises the issue as a legal argument in support of its preliminary injunction motion, not as a claim. The Village, a home rule municipality, contends that it complied with all substantive statutory and due process requirements and offers documentary evidence in support. Specifically, it offers proof that it publicized the public hearing on the Amended Ordinance sixteen days in advance, that it provided notice of the meeting to counsel for the Church, that it held a public meeting at the time and date publicized, and that the Board of Trustees voted to adopt the Amended Ordinance. *See* Def.'s Supp. Submission.

Illinois law requires only "notice of the time and place of the hearing, not more than 30 nor less than 15 days before the hearing" for zoning amendments. *See* 65 Ill. Comp. Stat. 5/11-13-14. It is well-established that a court "may not hold invalid [a] disputed ordinance unless it was enacted in violation of a constitutional provision or a provision of a State or Federal Statute." *Landmarks Pres. Council of Ill. v. City of Chicago*, 531 N.E.2d 9, 15 (Ill. 1988). The Church alleges no such violation. Instead, it argues that the Village's failure to comply with the procedural requirements of its own zoning ordinance renders the Amended Ordinance invalid. However, the cases it cites for this proposition are factually distinguishable from the case at bar and from *Landmarks*. *See, e.g.*, *Tierney v. Vill. of Schaumburg*, 538 N.E.2d 904, 907 (Ill. App. Ct. 1989) (enjoining a municipality's action which was in violation of its own valid ordinance,

---

[4]Day-care centers, although not specifically enumerated in the Amended Ordinance, are still allowed because they are included as a special use in a B-1 District and all B-1 District special uses are allowed as special uses in the B-2 District. *See* Amended Ordinance § 8.3(C).

namely a construction project that did not meet minimum right of way requirements); *People ex rel. J.C. Penney Props., Inc. v. Vill. of Oak Lawn*, 349 N.E.2d 637, 639-40 (Ill. App. Ct. 1976) (stating that "[a] municipality must follow its zoning ordinances" where the village had not followed either its own procedural requirements *or* those of the Illinois statute).

As a general principle, "[a] municipal ordinance is entitled to a presumption of validity and . . . the party challenging the ordinances at issue . . . has the burden of showing [its] invalidity [by clear and convincing evidence]." *O'Donnell v. City of Chicago*, 842 N.E.2d 208, 215 (Ill. App. Ct. 2005). In light of the partially-developed record and legal arguments presented, the Church does not meet its burden. Therefore, on the basis of a *prima facie* showing of compliance with legal requirements, the Amended Ordinance is entitled to a preliminary presumption of validity. As a result, the Village's motion to supplement the record is granted and the court considers the Amended Ordinance along with other evidence submitted in regard to the preliminary injunction motion.

## II. ANALYSIS

### A. Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original)). "Because a mandatory injunction requires the court to command the defendant to take a particular action, mandatory preliminary writs are ordinarily cautiously viewed and issued sparingly." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (internal quotation marks and citations omitted). To obtain a

preliminary injunction, a party must show that: (1) it is reasonably likely to succeed on the merits of its case; (2) it has no adequate remedy at law; (3) it will suffer irreparable harm, which outweighs the harm the non-moving party will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Goodman*, 430 F.3d at 437 (citing *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 619-20 (7th Cir. 2004)).

A court engages in "the sliding scale approach[:] the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)). The primary question for the court is whether the moving party has made a clear showing on the four prerequisites. *See Chi. United Indus. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006). However, where the court is "forc[ing] the parties to make significant alterations in their practices before there has been time for a trial on the merits," consideration of the status quo may be appropriate. *Id.* at 945 (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004)).

**B.    The Four Prerequisites For A Preliminary Injunction**

1.    Whether The Church Is Likely To Succeed On The Merits

The Church initially argued that it had a strong chance of succeeding on the merits of its RLUIPA claim because the Village allowed non-religious assemblies in the B-2 zoning district while categorically prohibiting churches. Pl.'s Mot. for TRO at 3. The Village argues that, even if there was a chance of success on the merits when the Church filed for a preliminary injunction, the Amended Ordinance moots the motion because it removes any language that could be

construed as a facial violation of RLUIPA.  *See* Def.'s Mot. to Supp. the Record ¶¶ 2, 5 (citing

*Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 849 (7th Cir. 2007) for the

proposition that a municipality may cure any claims of unequal terms by adopting curative

legislation).[5]

Additionally, the Church contends that the property's location in a TIF district and the

ban on granting liquor licenses to businesses within 100 feet of a church do not change the fact

that the exclusion of churches violates RLUIPA's Equal Terms provisions for which the Village

is strictly liable.  Pl.'s Post-Hearing Brief at 3-5.  The Church also argues that it has a strong

chance of succeeding on its freedom of speech claim because the Village prohibits the Church

from using the property solely because of the religious content of its speech.  Pl.'s Mot. for TRO

---

[5]In *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846 (7th Cir. 2007), the
Seventh Circuit addressed facts similar to those at bar.  A church had purchased property in an
area that was zoned industrial and that allowed membership organizations but not churches.  *Id.*
at 847.  The village amended its zoning ordinance after the church had purchased the property to
ban all membership organizations from the industrial district.  *Id.* at 848.  The Seventh Circuit
rejected the church's argument that it had a vested interest in continuing to operate a church in
the industrial zone based on its reliance on the facial invalidity, under RLUIPA, of the zoning
ordinance.  *Id.*  The court noted that there was no basis "for the proposition that the federal
Constitution forbids a state that has prevented a use of property by means of an invalid (even an
unconstitutional) enactment to continue to prevent that use by means of a valid one."  *Id.* at 849.
It observed that the church "knew or should have known that [the village] could redo its
ordinance to comply with the 'less than equal terms' provision of RLUIPA in one of two ways:
by permitting religious organizations in the industrial zone, or by forbidding all membership
organizations in the zone. [The church] could not reasonably assume that the [village] would
choose the first option."  *Id.*
    The Seventh Circuit recently reaffirmed its rejection of "the notion that a property owner
may rely on purported defects in prior versions of the law as the springboard to claim a vested
interest in property use for which it never obtained permission."  *Gen. Auto Serv. Station v. City
of Chicago*, 526 F.3d 991, 1005 (7th Cir. 2008) (discussing the similarities of its holding in *Petra*
and the Illinois Appellate Court's holding in *City of Elgin v. All Nations Worship Ctr.*, 860
N.E.2d 853 (2006)).  Thus, the ability of the Village to amend its zoning ordinance and thereby
attempt to moot the Church's RLUIPA claim is beyond question.

at 3.

Section (b)(1) of RLUIPA states: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).  "The equal-terms provision is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses." *Digrugilliers v. City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007) (citing *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1002-03 (7th Cir. 2006)).

In its February 27, 2008 order denying the Church's motion for a TRO (the "TRO Order"), the court found that: the Church qualifies as a "religious assembly or institution" under RLUIPA; § 8.3 of the Zoning Ordinance is the section at issue; churches are not allowed in the B-2 District; and the Church would need to secure an amendment to re-zone the Subject Property as residential and then obtain a special use permit to operate legally.  TRO Order at 4.  These factual findings remain undisturbed by the Amended Ordinance.  In the TRO Order, the court also concluded that the Church's argument that the "special uses" allowed under § 8.3(C), including art galleries, museums, public libraries, recreational buildings and community centers were "comparable" to religious use had presumptive merit "in that they permit groups of people to assemble for purposes that are not strictly commercial."  *Id.* at 4-5.

The Amended Ordinance has eliminated all of the comparable uses the court mentioned in its TRO Order.  Nevertheless, the Church contends that the Amended Ordinance discriminates against churches because it allows certain types of non-religious assemblies, such as

gymnasiums and day-care centers, while excluding religious assemblies. *See* Pl.'s Mem. in Opp'n to Def.'s Mot. to Supp. the Record at 3. Thus, according to the Church, the Amended Ordinance facially differentiates between religious and non-religious assemblies; this is as far as the court need go in its analysis as Seventh Circuit precedent requires no more than a facial differentiation between churches and non-religious assemblies to trigger RLUIPA. *See* Pl.'s Post-Hearing Reply Brief at 5 (quoting *Vision Church*, 468 F.3d at 1003, which delineated three types of Equal Terms discrimination, including facial discrimination).

The Village admits that, under the original Ordinance, "a first blush resolution in [the Church's] favor would seem to present itself based solely on the terms of the Village Zoning Ordinance." Def.'s Post-Hearing Mem. at 3. However, it argues that the Amended Ordinance cures any facial discrimination because "the permitted uses are all taxpaying, commercial uses designed to generate pedestrian activity, in furtherance of the goal to revitalize [Hazel Crest Proper] as a vibrant part of the community." Def.'s Supp. Mem. at 1. Consequently, the Village rejects the Church's interpretation of the terms "assembly or institution" as overly broad.

The Seventh Circuit has not had the opportunity to discuss an Equal Terms case on the basis of a fully developed record. For this reason, the court invited briefing on the variant Equal Terms tests established in *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*,[6] and *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*,[7] and the Seventh Circuit's decision in *Digrugilliers v. City of Indianapolis*.[8] The court stated that it was especially

---

[6]510 F.3d 253 (3d Cir. 2007), *cert. denied*, ___ U.S. ___, 128 S. Ct. 2503 (2008).

[7]450 F.3d 1295 (11th Cir. 2006).

[8]506 F.3d 612 (7th Cir. 2007).

interested in the tests as they would apply to a TIF district. In the resulting briefs, the Village urged the court to adopt the reasoning of the Third Circuit, while the Church urged the court to look no further than *Digrugilliers*. A brief overview of these cases is appropriate before the court embarks on determining the scope of the terms "assembly or institution" and analyzing what, if any, impact the TIF has on the Church's RLUIPA claim.

In *Primera Iglesia*, the Eleventh Circuit affirmed the district court's judgment, after a bench trial, that the defendant county did not violate the Equal Terms provision of RLUIPA by denying the plaintiff church a zoning ordinance. *Primera Iglesia Bautista Hispana of Boca Raton, Inc.*, 450 F.3d at 1299-1300. The Eleventh Circuit outlined a four-part test for an Equal Terms violation: "(1) the plaintiff must be a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the religious assembly on less than equal terms, with (4) a nonreligious assembly or institution." *Id.* at 1307. The court ruled that strict scrutiny applies to alleged violations and "the offending conduct may be upheld if the defendant establishes that the conduct employs a *narrowly* tailored means of achieving a *compelling* government interest." *Id.* at 1307-08.

In *Lighthouse*, the Third Circuit affirmed in part and vacated in part a grant of summary judgment to the defendant city. *Lighthouse Institute for Evangelism, Inc.*, 510 F.3d at 256. The court concluded that a zoning ordinance that barred churches from a business district did not violate the Equal Terms provision where the regulatory goal was to encourage an entertainment-oriented district. *Id.* at 270. It reasoned that churches were not similarly situated to other assemblies in that district because they were granted a protective zone away from liquor, which would interfere with commercial development of bars and restaurants in the district. *Id.* The

Third Circuit, explicitly disagreeing with the Eleventh Circuit's "expansive reading" of the statute, concluded that "a plaintiff asserting a claim under the RLUIPA Equal Terms provision must show (1) it is a religious assembly or institution (2) subject to a land use regulation, which regulation (3) treats the religious assembly on less than equal terms with (4) a nonreligious assembly or institution (5) *that causes no lesser harm to the interests the regulation seeks to advance*." *Id.* (emphasis added to show variance with Eleventh Circuit test). The court also rejected a strict scrutiny standard, instead applying a strict liability standard that paid attention to regulatory goals, holding that "if a land-use regulation treats religious assemblies or institutions on less than equal terms with nonreligious assemblies or institutions that are no less harmful to the governmental objectives in enacting the regulation, that regulation – without more – fails under RLUIPA." *Id.* at 266.

The case in *Digrugilliers* was before the Seventh Circuit on an appeal from denial of a preliminary injunction and was remanded for reconsideration of the balance of harms after the court reversed the lower court's finding that the case was unlikely to succeed on the merits. *Digrugilliers*, 506 F.3d at 618. A church had been told to relocate or apply for a variance because it was located in leased premises in the C-1 commercial zone. *Id.* at 614. Zone C-1 allowed assembly halls, community centers, funeral homes, art galleries, libraries, museums, and schools, but not churches. *Id.* at 614-15. The lower court had given two reasons for finding no likelihood of success on the merits, including that having a church in the C-1 commercial zone would interfere with other land uses because the church was entitled to protection from establishments that sell liquor or pornography. *Id.* at 616. The Seventh Circuit rejected this as a valid reason, saying that a grant of special privileges (like being free from offensive land uses)

13

does not "furnish the premise for excluding churches from otherwise suitable districts." *Id.* If like institutions are not granted such privileges, then the grant may violate the establishment clause by discriminating *in favor* of religion, which "cannot be a defense to a zoning exclusion challenged under the equal-terms provision of [RLUIPA]." *Id.* at 617.[9]

The Seventh Circuit has not issued an opinion on the Equal Terms provision since the circuit split emerged and has never fully addressed the test it would adopt. Nevertheless, the court believes that the Seventh Circuit would reject the Third Circuit *Lighthouse* test in favor of the Eleventh Circuit *Primera Iglesia* test for two primary reasons. First, the Seventh Circuit has cited approvingly to the reasoning of the court in *Primera Iglesia* in regard to the Equal Terms provision in at least two instances, although it has not explicitly adopted its four-part test. *See Digrugilliers*, 506 F.3d at 616 (citing to *Primera Iglesia* and other Eleventh Circuit cases for the proposition that the Equal Terms section "is violated whenever religious land uses are treated worse than comparable nonreligious ones"); *Vision Church*, 468 F.3d at 1003 (analyzing the facts pursuant to the three types of Equal Terms statutory violations identified in *Primera Iglesia*, namely a statute that facially differentiates, a facially-neutral statute that burdens only religious assemblies, and a neutral statute selectively enforced against religious assemblies). Second, the reasoning in *Digrugilliers* and *Lighthouse* is diametrically opposed in regard to the appropriateness of considering protective zones as part of an Equal Terms analysis. *Compare Digrugilliers*, 506 F.3d at 616-17 (rejecting protective zones as a reason for excluding churches from business zones), *with Lighthouse*, 510 F.3d at 270 (expressly disagreeing with *Digrugilliers*

---

[9]The court reads this to mean that a business unable to obtain a liquor license because it is located within the 100-foot protective zone around a church may have standing to pursue a cause of action challenging the constitutionality of such a protective zone.

and finding that a protective zone makes a church not similarly situated to other types of assembly).  Therefore, the court finds that the reasoning and holdings in *Vision Church* and *Digrugilliers* suggest the likelihood that the Seventh Circuit would adopt the Eleventh Circuit four-part test of *Primera Iglesia*.[10]

Having determined which test to follow, the court now turns to the issue of definition of terms.  The Seventh Circuit has not adopted a definition for the terms "assembly or institution," which are not defined in RLUIPA.  Therefore, in line with its adoption of the Eleventh Circuit Equal Terms test, the court turns to Eleventh Circuit case law for guidance:

> An "assembly" is "a company of persons collected together in one place [usually] and usually for some common purpose (as deliberation and legislation, worship, or social entertainment," or "[a] group of persons organized and united for some common purpose."  An institution is "an established society or corporation: an establishment or foundation esp. of a public character," or "[a]n established organization, esp. one of a public character . . . ."

*Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230-31 (11th Cir. 2004) (citing Webster's 3d Int'l Unabridged Dictionary (1993) and Black's Law Dictionary (7th ed. 1999) for the "ordinary or natural meanings" of the terms, brackets and additions in original).  Courts have determined that a wide range of businesses and facilities fall within this definition.  *See, e.g.*, *Chabad of Nova, Inc. v. City of Cooper City*, 533 F. Supp. 2d 1220, 1223 (S.D. Fla. 2008) (finding that "[d]ay care centers; indoor recreational facilities, including movie theaters; centers

---

[10]The court is not certain that there is a real difference between the Equal Terms tests used by the Eleventh and Third Circuits.  The Third Circuit rejects any strict scrutiny analysis, but in essence adds a strict scrutiny perspective in its analysis of comparability.  It looks to the government interest at stake in determining whether religious and non-religious uses are comparable.  The Eleventh Circuit applies strict scrutiny after adopting an extremely superficial analysis of comparability.  The court questions whether this is a real difference or only an apparent difference emerging from excessive attention to counting and refining "prongs."

offering personal improvement services such as aerobic studios, art, music, dance and drama schools; and places where people may gather for meetings and/or business related to trade associations or unions, all undoubtedly meet the definition of assemblies"); *Covenant Christian Ministries, Inc. v. City of Marietta*, No. 06 C 1994, at *24 (N.D. Ga. Mar. 31, 2008) (holding that "private parks and playgrounds and neighborhood recreation centers are assemblies or institutions, within the meaning of RLUIPA"). Therefore, on the basis of the record before it, the court concludes that the Church has a slight likelihood of showing that day-care centers and gymnasiums are "assemblies" and therefore prevailing on its claim that the Amended Ordinance violates RLUIPA pursuant to the four-part *Primera Iglesia* test.

The determining factor of whether the Church has a likelihood of success on its claim therefore becomes whether the Village's decision to exclude churches from the B-1 District would survive strict scrutiny.[11] The Village argues that the protective zone, where no liquor license could be granted to an establishment within 100 feet of the Church, would have a devastating effect on the TIF District's ability to attract the kinds of businesses it needs, essentially arguing that the TIF District is a narrowly tailored means of achieving the compelling government interest of revitalizing the community.

The Church argues that, under *Digrugilliers*, the fact that the Church is entitled to protection from establishments with liquor licenses is irrelevant. At the hearing, the court

_____

[11]The Church urges the court to adopt a strict liability standard, employed by the Third Circuit in *Lighthouse*, rather than a strict scrutiny standard, employed by the Eleventh Circuit in *Primera Iglesia*. *See* Pl.'s Post-Hearing Brief at 5-6. The court declines to adopt a "mix and match" test that incorporates elements of both the Third and Eleventh Circuit tests absent guidance from the Seventh Circuit or U.S. Supreme Court that such an approach is constitutionally valid.

queried whether the ability to grant liquor licenses is sufficiently important to the goals of the TIF District to differentiate it from *Digrugilliers* such as to compel a different outcome on the merits. The Church argues that the existence of the TIF makes no difference because "[t]he purpose of the TIF is to enable the Village to spur economic development, and so its argument that the protective zone will hinder that development is identical to the City of Indianapolis' argument that was rejected by the Seventh Circuit in *Digrugilliers*." Pl.'s Post-Hearing Brief at 4. The appellees in *Digrugilliers* argued that a religious use can prevent a neighbor from obtaining or renewing a liquor license and that, therefore, the barring of churches from the commercial district was narrowly tailored to meet the city's "compelling interest in economic development." *See* Appellee's Brief, *Digrugilliers*, No. 07-1358, at 9-10, 16, http://www.ca7.uscourts.gov/briefs.htm. The Village counters that "*Digrugilliers* did not involve a municipality with a specific, proactive and targeted economic development plan for a small segment of its community. But the *Lighthouse* case did, and this case does." Def.'s Reply Mem. at 4. Here, the Village argues, the very purpose of the TIF will be thwarted by an exception to the Zoning Ordinance because the Church's protective zone will inhibit the development of the of types of businesses that the transit-oriented development plan was designed to encourage; this will result in a snowball effect whereby the Village may be unable to attract the critical mass of retail establishments necessary to accomplish the goals of its TIF plan.

The parties' arguments make it clear that whether the TIF takes the existence of the protective zone outside the contemplation of *Digrugilliers* is an intensely factual determination that is inappropriate for resolution until the record is fully developed. The court is aware,

however, of the uphill battle the Village faces to prevail under a strict scrutiny standard. Therefore, the court finds that, for purposes of the preliminary injunction, the Church's argument that the Zoning Ordinance violates 42 U.S.C. § 2000ccc(b)(1) has presumptive merit for two reasons: (1) the Church's argument that the facial discrimination against religious uses in the Village's Zoning Ordinance is a violation of RLUIPA has a slight likelihood of success under the *Primera Iglesia* test; and (2) the Village's arguments regarding the Church's impact on the TIF's goals are interwoven with its arguments regarding the necessity of avoiding any protective zone, and the Church is likely to succeed in arguing that these grounds do not justify excluding churches from otherwise appropriate zones pursuant a strict scrutiny test following the reasoning of *Digrugilliers*. Therefore, the Church has established a sufficient likelihood of success on the merits for preliminary injunction purposes. However, because the likelihood of success is not great, the balance of irreparable harms must strongly favor the Church's position in order to succeed on a preliminary injunction motion.

        b.      <u>Freedom of Speech Claim</u>

In its initial motion, the Church argues that the Zoning Ordinance discriminates against the Church based on the content of its speech. Pl.'s Mot. for TRO at 8. However, the Church's post-hearing brief concentrates only on the Equal Terms argument, as do its memoranda in opposition to the defendant's motion to supplement the record. There is nothing in the briefs to help the court understand how the evidence presented at the preliminary injunction hearing applies to the Church's Free Exercise argument or how the First Amendment, independently of RLUIPA, gives rise to the injunctive remedy requested. The Church contends that it is entitled to a presumption that the preliminary injunction elements are satisfied because the Village "has

not defended against the Church's freedom of speech claim." Pl.'s Post-Hearing Reply Brief at 3. However, the burden is on the plaintiff to convince the court, especially when requesting a mandatory injunction, and the court signaled its need for additional briefing on these issues. In light of the inadequate briefing, and because the court has found that there is a likelihood of success on the merits for the RLUIPA "equal access" claim, it does not consider the First Amendment argument.

2.  <u>Whether The Church Has An Adequate Remedy At Law</u>

To show that no adequate remedy at law exists, a plaintiff must "show that an award of damages at the end of trial will be inadequate [or] seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). The Church argues that it "cannot be adequately compensated for the loss of its right to engage in worship and worship-supporting activities on its property. . . . Moreover, the precise harm to the Church is the loss of its right to freely exercise its religion *on its property*." Pl.'s Post-Hearing Brief at 10 (emphasis in original). It states that "Pastor Alexander's testimony demonstrates that the Church cannot be adequately compensated for the loss of its right to engage in worship and worship-supporting activities on its property." *Id.* at 10; *accord* Pl.'s Post-Hearing Reply at 3. Although the Church does not direct the court to the location in the record where Pastor Alexander so stated, the court has reviewed the record for facts to support this conclusion. As detailed in II(B)(3), *infra*, Pastor Alexander testified that, if it does not get its Special Use Permit, the Church will be forced to conduct its Sunday and Wednesday services in a disfavored location and be unable to expand its mission work as hoped. These damages are not monetary in

nature and the Church would not be made whole if it prevails on the merits and is awarded damages. Thus, the Church has shown that it does not have an adequate remedy at law.

3.  Whether The Church Will Suffer Irreparable Harm That Outweighs The Harm The Village Will Suffer If The TRO Is Granted

The concept of "irreparable harm" is similar to that of "adequate remedy at law," except that "[t]he requirement of irreparable harm is needed to take care of the case where, although the ultimate relief that the plaintiff is seeking is equitable, . . . [it] can easily wait till the end of trial to get that relief." *Roland Mach. Co.,* 749 F.2d at 386. It is well-established that "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). *Accord Nuxoll v. Indian Prairie School District No. 204*, 523 F.3d 668, 669 (7th Cir. 2008) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Church argues that this presumption of harm applies equally to RLUIPA claims because they implicate the Free Exercise provision of the First Amendment.[12]

Some cases that the Church cites hold that a finding of a violation of RLUIPA automatically leads to a presumption of irreparable harm due to interference with First Amendment freedoms.[13] *See, e.g.*, *Murphy v. Zoning Comm'n*, 148 F. Supp. 2d 173, 180 (D.

---

[12]The Village does not respond to these arguments; instead it focuses on the balance of harms.

[13]Some cases the Church cites are inapposite in that they discuss RLUIPA's unconstitutional predecessor, the Religious Freedom Restoration Act ("RFRA"), and/or prisoners' First Amendment rights. *See, e.g.*, *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (RFRA case discussing whether a prison could deny a prisoner visits from a pastor); *Amaker v. Goord*, 06-CV-490E, 2007 WL 4560596 (W.D.N.Y. Mar. 9, 2007) (considering

Conn. 2001) (finding a presumption of irreparable harm where the government attempted to stop a religious group from meeting in a house because RLUIPA "was enacted for the express purpose of protecting the First Amendment rights of individuals[; therefore], the allegation that defendants have violated [RLUIPA] also triggers the same concerns that led the courts to hold that [constitutional] violations result in a presumption of irreparable harm"). The courts typically base this conclusion on a presumption that Congress enacted RLUIPA to codify existing jurisprudence interpreting the Free Exercise clause.

Other courts have analyzed the facts of RLUIPA cases in a way that mitigates against an automatic presumption of harm in favor of a more nuanced evaluation of the intersection of land regulation and religious freedom. For example, in *Lighthouse*, the Third Circuit points out that although RLUIPA defines religious expression to include land use, the Free Exercise Clause itself has no such expansive definition. 510 F.3d at 274 (citing to cases in the Tenth, Sixth, and Fifth Circuits that support such a finding). Thus, the *Lighthouse* court held that "when a religious plaintiff makes a Free Exercise challenge to a zoning regulation, it must explain in what way the inability to locate in the specific area affects its religious exercise." *Id.* This rejection of an automatic presumption appears to be in line with Seventh Circuit reasoning. For example, in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003), the court observed, as part of an equal protection analysis, that "[w]hatever the obstacles that the [zoning ordinance] might present to a church's ability to locate on a specific plot of . . . land, they in no

whether a prison could mandate that prisoners cut their hair where the wearing of dreadlocks is an expression of religious faith).

way regulate the right, let alone interfere with the ability, of an individual to adhere to the central tenets of his religious belief." *Id.* at 766.

The court believes the latter approach is appropriate given existing Free Exercise jurisprudence,[14] which cautions that "Congress does not enforce a constitutional right by changing what the right is." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). In *City of Boerne*, the Supreme Court considered a challenge, under RLUIPA's predecessor statute, the Religious Freedom Restoration Act 42 U.S.C. § 2000bb *et seq.* ("RFRA"), to the denial of a building permit to a church. *Id.* at 511. The Court reasoned that RFRA was designed not to remedy laws motivated by religious bigotry, but to address circumstances where religion was incidentally burdened by a law of general applicability. *Id.* at 535. Such broad-reaching legislation exceeds Congress's remedial powers under § 5 of the Fourteenth Amendment. *Id.* at 511. The Court therefore struck down RFRA as unconstitutional. *Id.* at 536. The Court has not opined on whether the land use regulation provisions of § 2 of RLUIPA are consistent with congressional powers.[15] *But see Midrash Sephardi, Inc.*, 366 F.3d at 1235-42 (concluding that

---

[14]*See, e.g.*, *Employment Division v. Smith*, 496 U.S. 913 (1990) (holding that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest); *see also City of Boerne v. Flores*, 521 U.S. 507 (1997) (holding that RFRA, enacted in response to *Smith*, exceeded Congress's power under § 5 of the Fourteenth Amendment).

[15]*See Cutter v. Wilkinson*, 544 U.S. 709, 716 n.3 (2005) (noting, while upholding the constitutionality of RLUIPA's protections of religious exercise by institutionalized persons, that "Section 2 of RLUIPA is not at issue here. We therefore express no view on the validity of that part of the Act."). The *Lighthouse* plaintiff filed a petition for a writ of certiorari, which the Supreme Court denied on May 27, 2008. *See Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, ___ U.S. ___, 128 S. Ct. 2503 (2008). The petitioner raised as a reason for granting the writ that "[t]he Court of Appeals are divided over construction of the Equal Terms Provision of [RLUIPA]; over construction of the Free Exercise Clause of the First Amendment in the religious land-use context; and over the relationship between those two issues." *See*

the Equal Terms provision "is an appropriate and constitutional use of Congress's authority under § 5 of the Fourteenth Amendment" and that RLUIPA "does not violate the Establishment Clause"). Because the manner in which the Equal Terms provision intersects with the Free Exercise Clause in the religious land use context is in dispute, the court declines to apply an automatic presumption of harm for First Amendment violations in the land use context. Rather, it turns to the facts to make an individual determination.

The Church argues: "The fact that the Church has limited access . . . to a (dirty) facility in a neighboring city does not negate that it is suffering irreparable harm at the hands of the Village. Otherwise, no church would ever be eligible for an injunction under RLUIPA, because the government could always point to other locations where a church could locate." Pl.'s Post-Hearing Brief at 10. Pastor Alexander testified about several types of mission work that the Church wants to do at the Hazel Crest property. *See* Tr. 16:1-18:1 (describing a plan to conduct a women's ministry, literacy program, mentoring program, and business ventures); Pl.'s Ex. Binder, Ex. F (Church's business plan discussing its plans for the Hazel Crest location). Pastor Alexander also explained that the Church is unable to conduct these mission activities given the limited space and time it has at the leased location. Tr. at 15:22-16:5. Finally, she discussed the maintenance and heat problems with the current leased location. *Id.* at 8:5-17. The record shows that the Church, because it is unable to obtain the necessary permits, is forced to conduct its Sunday and Wednesday services in a disfavored location and is unable to expand its mission work as hoped.

---

*Petition for Writ of Certiorari*, No. 07-1111, 2008 WL 534794, at **11-12 (Feb. 25, 2008).

On one hand, although the Pastor's testimony clearly shows that the current leased location is insufficient for the Church's purposes, it does not show the importance of the specific property at issue to its mission. In fact, Pastor Alexander testified that "[i]nitially, we weren't really sure if that was the property [we should buy], we continued to look, and after that we felt that it would be suitable," *id.* at 10:9-11. The Church's decision to buy was based primarily on price and location, *id.* at 5-6, factors that do not fall within the protective ambit of the First Amendment, as well as erroneous legal advice concerning the likelihood of obtaining a variance. Additionally, the Church offered no evidence of tangible reasons for irreparable harm, for example that it would be unable to sell the property in the current market or that it would be unable to find another suitable location in Hazel Crest but outside of the TIF District.[16]

On the other hand, a review of the Church's business plan reveals that the specific property has great importance to the Church's goals and ability to succeed in its ministry. *See* Pl.'s Ex. Binder, Ex. F. The Church's objectives include to "empower communities" and to "transform economic conditions." *Id.* § 1.1. The plan explains that the Church "take[s] a grass roots, hands on approach to neighborhood revitalization and community reorganization" and that, "with its location in close proximity to the Metra station, [the Church] will be a focal point in the area, promoting a sense of community, identity, and a sense of 'place.'" *Id.* § 1.0. As a result, the Church sees its "physical position in the community as a critical part of [its] efforts. The location solidifies our commitment to the village and to its residents." *Id.* § 4.0. In her testimony, the Pastor described how the Church planned to conduct a women's ministry, literacy

---

[16]It is unclear from the record whether, as the Village continues its development in the TIF, the subject property will be subject to an eminent domain effort and whether any other suitable property is currently available outside the TIF.

program, mentoring program, and assist with fledgling small business ventures. Tr. 16:1-18:1. She also mentioned how the Church considered the high local reading scores as important for the success of its literacy program. *Id.* at 17:3-5. A reasonable inference is that the admittedly blighted area of Hazel Crest Proper, and its TIF aspirations, would assist the Church to accomplish its mission by providing a location in which it can be a "focal point" and open its services to the wider population of Hazel Crest. A location isolated from the residents, or in an already developed area, would not fit with the goals of the Church; its inability to occupy its premises prevents it from carrying on its ministry effectively. Thus, the Church has shown it is suffering irreparable harm. However, it has not made a "clear showing" that its irreparable harm will outweigh that of the Village.

The grant of a mandatory preliminary injunction would give the Church virtually all of the relief it seeks in the case by requiring the Village to grant a zoning exception in the B-2 District to the Church for an indeterminate period of time until the merits of the case can be resolved. Such an invalidation of the Amended Ordinance, which in the eyes of the Village more accurately reflects the commercial redevelopment goals put in place with the Zoning Ordinance in 2000, will cause confusion and uncertainty for current and potential property owners in the B-2 District. The Village has approximately 15,000 residents. Tr. 47:9. It has determined, via its elected representatives, that community revitalization is a priority. *Id.* at 53:21-25. To that end, in the year 2000, it created a TIF District. *Id.* at 54:15-20. It re-emphasized its priorities with the passage of the Amended Ordinance in 2008. The hope is to attract transit-oriented development. *Id.* at 56:1-10. The Village has in excess of a million dollars earmarked to spend on the TIF District, including half a million in TIF funds, and has

already spent "a couple hundred thousand dollars" on plans. *Id.* at 63:2-20. Also, outside funders have provided $452,000 to the Village to help it meet its redevelopment goals. *Id.* at 57:24-58:3. Although no new businesses have relocated to the area, the preparation work continues. *Id.* at 75:16-76:2, 56:23-57:19.

The Church argues that the Village's only harm is financial and financial harm is not irreparable. The Village admits that the loss of tax revenue from the property is one of its concerns about a church occupying the space. But the record shows that the impact of a church in the TIF could be more than financial; it could affect the ability of the Village to attract the kinds of business it wants to attract to the "transit-oriented zone," and to create the environment it needs to ensure a critical mass of retail in the Hazel Crest Proper district (which is already challenging).[17] Tr. 90:24-91:2, 93:6-9; Def.'s Ex. Binder, Tab 5 (Village's 2007 Comprehensive Plan showing schematics for the TIF District); Amended Ordinance (stating that it eliminates certain categories of use as inconsistent with long-term planning interests, commercial development and redevelopment). Although such a result would not be immediate, the potential for extreme harm to the Village's goals is significant. Unfortunately, there is nothing in the record to demonstrate that the Village could sever the parcel of land on which the Church sits from the TIF, even temporarily until the court can rule on the merits, without damage to the overall development plan.[18] Therefore, on the record before it, the court concludes that the

---

[17]Indeed, the Church's own business plan implicitly assumes that Hazel Crest Proper will be the type of neighborhood to which residents will want to come and that it will become revitalized.

[18]The property at issue is located at the far northwest tip of the TIF, away from the area directly surrounding the Metra station. Without evidence, the court can only speculate on whether a "carve-out" of the subject property would be possible, feasible, or desirable.

irreparable harm the Village would suffer from interference with the goals of the TIF outweighs that of the Church's inability to occupy the premises.

        4.      <u>Whether The Injunction Will Harm The Public Interest</u>

The Church argues that the public interest will not be harmed and that its "religious exercise rights far outweigh the Village's economic concerns." Pl.'s Post-Hearing Reply Brief at 11. The court does not find the Village's interests to be as minor as the Church suggests. Enforcing the Church's right to worship and ensuring that the Village can fulfill its economic development goals are both in the public interest.

### III. CONCLUSION

The plaintiff has shown a slight likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the preliminary injunction is denied. The public interest appears to be equally balanced between granting and denying the injunction. The dispositive factor in the preliminary injunction balancing analysis, then, is the balance of the irreparable harms suffered by the Church and the Village. Using the "sliding scale" approach, and because the court concludes that the Church has only a slight chance of success on the merits, the balance of harms needs to favor the Church's position strongly. Mindful that the plaintiff's burden of persuasion when moving for a mandatory injunction is high, the court finds that the Church has not met its burden on this element. Thus, that analysis favors denying the injunction. The Church's motion for a preliminary injunction is consequently denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 14, 2008